# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ROBERT MASON**
                    **Plaintiff,**

          **v.**                                        **Case No. 11-C-1015**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
                    **Defendant.**

## DECISION AND ORDER

Plaintiff Robert Mason applied for social security disability benefits, alleging inability to work due to, <u>inter alia</u>, back, neck and knee problems, fibromyalgia, lupus, diabetes with neuropathy, and depression. The Social Security Administration ("SSA") denied his application initially and on a request for reconsideration (Tr. at 71-84), so plaintiff asked for a hearing before an Administrative Law Judge ("ALJ") (Tr. at 85). However, the ALJ likewise found plaintiff not disabled. (Tr. at 10-24.) Plaintiff asked the Appeals Council to review the ALJ's decision, but the Council declined (Tr. at 1), making the ALJ's decision the final word from the SSA on plaintiff's application. <u>See</u> <u>Shauger v. Astrue</u>, 675 F.3d 690, 695 (7th Cir. 2012). Plaintiff now seeks judicial review of the ALJ's decision.

## I. APPLICABLE LEGAL STANDARDS

### A.    Judicial Review

The court reviews an ALJ's decision to ensure that it is supported by "substantial evidence," sufficiently explained, and based on the proper legal criteria. <u>See, e.g.</u>, <u>Jelinek v. Astrue</u>, 662 F.3d 805, 811 (7th Cir. 2011); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 568 (7th Cir.

2011); Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). Substantial evidence "means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Under this deferential standard, if reasonable people could differ over whether the claimant is disabled, the court must uphold the decision under review. Schmidt v. Apfel, 201 F.3d 970, 972 (7th Cir. 2000).

Nevertheless, while the reviewing court may not re-weigh the evidence or substitute its judgment for that of the ALJ, "it must be more than an uncritical rubberstamp." Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984). The court must conduct a critical review of the entire record, ensuring that the ALJ adequately discussed the issues and considered the important evidence. See, e.g., McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011); Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996). The ALJ need not discuss every piece of evidence in the record, but if he fails to support his conclusions adequately or skips over entire lines of evidence supporting a finding of disability, the court will remand. Jelinek, 662 F.3d at 811 (citing Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009)); Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009). Further, the court must limit its review to the reasons articulated by the ALJ in the written decision; the Commissioner's lawyers may not fill in any gaps in the ALJ's analysis. See, e.g., Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010). Even if the Commissioner is able to point to evidence in the record supporting the decision, the court cannot affirm if the ALJ failed to build an accurate and logical bridge between the evidence and the result. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). Likewise, if the ALJ commits an error of law, "reversal is required without regard to the volume of evidence in support of the factual findings." Binion on Behalf of Binion v. Chater, 108 F.3d 780, 782 (7th Cir.1997).

**B.     Disability Standard**

The SSA determines disability pursuant to a five-step sequential analysis.  Craft v. Astrue, 539 F.3d 668, 673 (7th Cir. 2008).  At the first step, the ALJ considers whether the claimant is engaging in substantial gainful activity ("SGA"); if so, the claimant will be deemed not disabled.  At step two, the ALJ determines whether the claimant suffers from a "severe" physical or mental impairment; if not, he will be deemed not disabled.  At step three, the ALJ compares the claimant's impairment to a list of impairments that are considered conclusively disabling.  If the impairment meets or equals one of these "Listings," the claimant is considered disabled; if the impairment does not meet or equal a Listing, then the evaluation continues.  At the fourth step, the ALJ assesses the claimant's residual functional capacity ("RFC") and ability to engage in past relevant work; if the claimant can return to past relevant work, he is not disabled.  If the claimant cannot engage in past work, the evaluation continues to the fifth step and an assessment of whether, given the claimant's RFC, age, education, and work experience, he can transition to other work; if the claimant can engage in other work, he is not disabled.  Id. at 674.

The claimant bears the burden of proof at each of the first four steps.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).  However, if he reaches step five the burden shifts to the agency to establish that the claimant can perform other work that exists in a significant quantity in the national economy.  Liskowitz v. Astrue, 559 F.3d 736, 740 (7th Cir. 2009).  The Commissioner may at step five rely on a vocational expert's assessment of the types of occupations in which the claimant can work and the availability of positions in such occupations.  Weatherbee, 649 F.3d at 569.

## II.  FACTS AND BACKGROUND

**A.      Plaintiff's Application and Supporting Materials**

On May 30, 2008, plaintiff applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging inability to work since November 22, 2007.  (Tr. at 167-74.)  In a disability report, plaintiff attributed his inability to work to epilepsy, spinal fusion, diabetes with neuropathy, degenerative arthritis, gastritis, depression, tinnitis, heart blockage, bulging discs in his back, knee problems, and depression. (Tr. at 205.) He indicated that he had limited range of motion and severe pain due to the spinal fusion, limited mobility due to arthritis in his knees, and  low energy due to pain and depression. (Tr. at 205.) He also indicated that he had trouble controlling his diabetes due to multiple medical conditions, causing pain and numbness in his extremities.  He further reported depression due to severe medical conditions, being unable to consistently work and support his family after the murder of his wife and child in 2004.  He wrote that he stopped working on May 28, 2008, based on his doctor's orders.  (Tr. at 205.)  He indicated that he worked at an institution for the developmentally disabled for many years: as a resident care technician from June 1998 to January 2005 and as a food service worker from January 2005 to May 2008.  (Tr. at 206.)

In a function report, plaintiff wrote that on a typical day he did his physical therapy exercises, rested his back, read, watched TV, and shopped as needed.  (Tr. at 213.)  He indicated that he had five children living with him, ages eleven to nineteen, and they helped with the chores because of his medical problems.  (Tr. at 214.)  He wrote that he was able to tend to his personal care, but his children did most of the cooking and other household chores. (Tr. at 214-15.)  He indicated that he was able to drive, shop, and handle money.  (Tr. at 216.)

4

He identified hobbies of watching TV and playing chess. (Tr. at 217.) He described difficulty lifting, bending, and squatting due to his knees, and indicated that he could walk for about two blocks before he needed to stop and rest. (Tr. at 218.) Finally, he indicated that he was in pain twenty-four hours a day, from his head to his toes. (Tr. at 219.)

In a physical activities questionnaire, plaintiff indicated that he could not stand or walk for long periods, and that his doctor would not allow him to lift, bend, or twist, which his job required. (Tr. at 221.) He wrote that he stood 6' tall and weighed 280 pounds. (Tr. at 221.) He indicated that he could sit for one hour, stand for twenty minutes, and walk for ten minutes. He wrote that in a day, he would sit eight hours, stand fours hours, and walk one hour. (Tr. at 222.) He indicated that he could sit in and drive a car for one hour. (Tr. at 223.) His doctor did not want him to lift any weight. (Tr. at 223.)

In a seizure questionnaire, plaintiff indicated that medication controlled his seizures, which he only experienced when sleeping. (Tr. at 226.) He stated that he experienced five seizures within the past year, and that these attacks lasted no more than five minutes. (Tr. at 227.)

In a third party function report, a friend indicated that plaintiff did little around the house; his children did most of the chores. (Tr. at 241-43.) He spent most of his time watching TV. (Tr. at 245.) He could walk fifty to 100 feet before he had to stop and rest. (Tr. at 246.) In her remarks, the friend indicated that plaintiff's depression was worsening and due to increasing weakness he left the household neglected. (Tr at 248.)

In later function reports, plaintiff indicated that he could lift twenty-five pounds and walk 100 to 200 yards before he had to stop and rest. (Tr. at 254.) He wrote that he got along well with authority figures but did not handle stress very well. (Tr. at 255.) In his remarks, he noted

5

more trouble with his knees, making it harder to walk and climb stairs, and complained of pain in his back and neck, as well as stroke-like symptoms affecting his facial muscles.  (Tr. at 256.) He further indicated that his short-term memory seemed to be going.  (Tr. at 266.)

## B.    Medical Evidence

### 1.    Treatment Records

In March of 2007, plaintiff underwent cervical spine fusion surgery.  X-rays taken three months post-surgery showed a stable anterior cervical decompression fusion of C5 to C7 (Tr. at 318), and when he saw his surgeon, Dr. Ofer Zikel, for follow-up in June 2007, plaintiff reported doing well, with his pre-operative symptoms resolved.  Dr. Zikel continued plaintiff off work for another month, as his job required heavy repetitive lifting, including overhead (Tr. at 333, 334), with plaintiff commencing a three month course of physical therapy (Tr. at 458-72).

In June of 2007 plaintiff also saw Dr. Janel Schneider, his neurologist, for follow-up of his epilepsy.  He had recently undergone EEG testing, without any of his typical seizures being recorded.  He had been maintained on Depakote for several months and reported no seizures since his last visit in February.  (Tr. at 336.)  Dr. Schneider declined to alter plaintiff's treatment regimen until after he recovered from the cervical fusion.  (Tr. at 335.)

On July 26, 2007, plaintiff saw Dr. Zikel's physician's assistant ("PA"), Tahseen Samdani, complaining of radiating symptoms into his right foot, numbness of the neck, and arm pain.  (Tr. at 330.)  He attributed some of his neck pain to a recent bout of coughing,[1] and he denied numbness or tingling in either arm.  On exam, gate and station were normal, his strength and coordination were normal in all four extremities, and x-rays taken on July 12,

---

[1]Another doctor diagnosed pneumonia with bronchospasm.  (Tr. at 332.)

2007, showed stable position of the hardware and grafts. (Tr. at 316, 330.) PA Samdani ordered repeat cervical spine x-rays, which again showed a stable alignment. (Tr. at 317, 329.) Plaintiff was to continue with physical therapy and shoulder range of motions. Plaintiff also complained of right lower extremity pain secondary to degenerative changes. Since he showed no weakness or sensory loss, conservative treatment was recommended. (Tr. at 329.)

On July 30, 2007, plaintiff saw Dr. Ronald Schulgit, his primary care physician, complaining of cervical radiculopathy, with acute and chronic anxiety, hypertension, and diabetes. He also complained of a cough. Dr. Schulgit assessed bronchitis and prescribed Zithromax and Phenergan with codeine. (Tr. at 328.) He was to return in four months' time. (Tr. at 327.)

On August 23, 2007, plaintiff returned to Dr. Zikel for follow-up of his anterior cervical discectomy and fusion, requesting a return to work form. Dr. Zikel authorized him to return to work half days for two weeks, followed by full time work. (Tr. at 326.) On September 6, plaintiff saw PA Samdani and reported being free of pain since last visit in August, but he experienced a recurrence after his son slapped the back of his neck. He denied paresthesias,[2] weakness, or sensory loss. He planned to return to full-time work later that week. Tr. at 351.) X-rays taken on September 5 were stable. (Tr. at 313, 351.)

On September 7, 2007, plaintiff saw Dr. Schneider for follow up of his epilepsy. He reported experiencing two to four seizures per year despite medication, but just one since his last visit in June. Plaintiff had been back to work part-time for two weeks following his surgery and was to return full-time the next day. He reported no other specific concerns. (Tr. at 349.)

_____

[2]Paresthesia is an abnormal sensation, such as burning, pricking, or tingling. Stedman's Medical Dictionary 1316 (27th ed. 2000).

7

They discussed a transition from Depakote to Keppra, which they would initiate on his next visit in four months. (Tr. at 348.)

On September 19, 2007, plaintiff went to the emergency room complaining of chest pain. (Tr. at 436.) An EKG and other tests were essentially normal, and plaintiff's pain reduced with nitroglycerine and aspirin. (Tr. at 437, 449, 450.) Plaintiff was admitted for observation with a diagnosis of chest pain, likely acute coronary syndrome. (Tr. at 438.) The on-call cardiologist, Dr. R.R. Sriram, noted that plaintiff underwent a coronary angiogram two years previously and was found to have a small blockage in one of the branches of the coronary arteries. (Tr. at 442.) Dr. Sriram diagnosed atypical chest pain and admitted plaintiff to telemetry. (Tr. at 443.) A September 20 stress test was normal (Tr. at 444, 456), as was an electrocardiogram (Tr. at 290-91).

On September 28, 2007, plaintiff saw Dr. Schulgit for follow up. He reported being under a great deal of stress recently and related his recent trip to the emergency room. (Tr. at 347.) He further reported some claudication (i.e., limping)[3] when walking distances. (Tr. at 346.)

On October 19, 2007, plaintiff returned to PA Samdani for follow-up of his cervical condition, reporting no changes since his last visit, still complaining of dull, constant, right-sided neck pain, exacerbated by neck extension and relieved by rest. His pain was managed effectively by use of Tylenol, and he had been working full-time. PA Samdani ordered new scans (Tr. at 344-45), and a cervical spine x-ray revealed showed stable post-operative changes (Tr. at 310). On October 29, plaintiff advised PA Samdani that in the past ten days

---

[3]Stedman's Medical Dictionary 360 (27th ed. 2000).

his right sided neck pain entirely resolved. His only complaint was bilateral shoulder pain, which he attributed to arthritis and treated with Tylenol. (Tr. at 343.) Plaintiff was instructed to perform shoulder range of motion exercises; should he have another flare-up, they would obtain shoulder images. He was to return in three months for a final check of his neck. (Tr. at 342.)

On November 22, 2007, plaintiff went to the emergency room, complaining of right arm and face numbness. He indicated that for the past week he experienced three to four episodes per day in which numbness started in his hand, went up his arm, and then into his face; he stated that during these episodes he felt that he lost control of his right eyelid. The episodes lasted three to four minutes, then resolved on their own. He also complained of headaches over the past two weeks, lasting ten to fifteen minutes on the right side. He reported a history of seizure disorder but stated that these episodes were unlike any previous seizure. (Tr. at 412.) He reported no chest pain or shortness of breath. Dr. M.P. Jones, concerned about transient ischemic attack, ordered various tests, which were generally negative. (Tr. at 413.) He then provided aspirin and, after discussing the matter with Dr. Schulgit, admitted plaintiff for further evaluation and observation. (Tr. at 414.) A head CT scan showed no acute intra-cranial process, with possible small lymph nodes in the right occipital region. (Tr. at 309, 429.) Dr. Schulgit assumed plaintiff's care, noting that during his hospitalization plaintiff was observed having one of these attacks in which he was unable to open his eye; he showed no facial droop and remained responsive. Neurological exam was otherwise unremarkable. (Tr. at 415.) Dr. Schulgit assessed seizure disorder and possible transient ischemic attack, and referred him to Dr. Stephen Pagano, who suggested additional tests. (Tr. at 416, 421.)

Plaintiff underwent a battery of tests on November 23, 2007: an EEG based on

complaints of pain and uncontrollable movements of the upper extremities, which was abnormal (Tr. at 294-95, 424-25); a brain MRI, which was essentially normal (Tr. at 306-07, 431-32); an ultrasound, which showed no evidence of carotid artery stenosis (Tr. at 308, 430); and an echocardiogram, which showed no significant abnormalities (Tr. at 422-23). A November 24 head MRA showed normal intra-cranial vessels. (Tr. at 305, 433.)

On November 27, 2007, plaintiff returned to Dr. Schulgit, who provided a trial of Phenobarbital with Neurontin for further control of his seizures. Plaintiff was to continue on Depakote and other medications. (Tr. at 341.) Dr. Schulgit assessed seizure disorder and diabetes. Plaintiff had full range of motion and no radiculopathy, but occasional facial and right arm paresthesias persisted. (Tr. at 340.)

On November 29, 2007, plaintiff went to the emergency room complaining of right-sided headache with facial paresthesias and intermittent difficulty with speech. He also complained of a two week history of intermittent headaches throughout the day, lasting ten to fifteen minutes. Despite an extensive work-up on his previous admission, these same symptoms persisted. (Tr. at 408.) Dr. J.M. Soyka contacted the on-call neurology physician, who suggested increasing Gabapentin. Dr. Soyka also provided Ativan and discharged plaintiff in stable condition. (Tr. at 409.)

On December 3, 2007, plaintiff saw Dr. Pagano regarding his episodes of numbness involving the right face, arm, and leg. Dr. Pagano ordered a forty-eight hour EEG to see if these episodes could be documented; he also started to transition plaintiff from Depakote to Keppra. (Tr. at 339.) Plaintiff was to remain off work. (Tr. at 338.) Plaintiff returned to Dr. Pagano on December 12, still experiencing sensory symptoms on the right. Dr. Pagano assessed episodes of right hemiparesthesia, intermittent, and again ordered a forty-eight hour

10

EEG.  (Tr. at 337.)   On December 19, plaintiff advised Dr. Pagano that he had been feeling terrible, with sensory abnormalities on the right side.  Dr. Pagano questioned whether plaintiff was experiencing sensory seizures and noted that he was to undergo the EEG the next week.  On December 26 and 27, plaintiff underwent a twenty-four hour EEG test related to his complaints of facial numbness, which was abnormal.  (Tr. at 292-93.)

On January 2, 2008, plaintiff returned to Dr. Schneider.  Since his last visit, plaintiff reported developing a new problem of intermittent episodes of right hemibody paresthesia.  He had been placed on Keppra on the belief that this was related to seizures, with no improvement.  He also complained of right-sided throbbing headache.  (Tr. at 354.)  Dr. Schneider discontinued Keppra and provided Topamax.  She doubted his paresthesia related to seizure but rather suspected complicated migraines.  She provided a work release for the next four weeks as his medications were adjusted.  (Tr. at 352-53.)  She also reviewed the recent EEG testing, indicating that the presence of focal sharp waves in the left frontal region confers an increased risk of partial onset seizures from this region.  Plaintiff had a total of four of his typical episodes of right sided numbness during the record, none of which had any correlation to abnormal EEG activity.  (Tr. at 406.)

On January 31, 2008, plaintiff saw Dr. Schulgit, who indicated that he was awaiting Dr. Schneider's input regarding facial numbness.  Plaintiff to return in one month.  (Tr. at 364.)  Plaintiff saw Dr. Schneider on February 1, reporting continued right-sided tingling with headache on a daily basis, mildly improved on Topamax.  Plaintiff had been off work for several months.  (Tr. at 360.)  She referred him for repeat EEG testing and continued Depakote.  She held off on further treatment of right hemibody paresthesias with headache pending further testing.  Dr. Schneider also suspected depression was playing a role in his symptoms (Tr. at

11

359), but plaintiff declined a psychiatric referral. Dr. Schneider filled out a work status report stating that plaintiff could return to work part-time for the next month. Dr. Schneider found it essential to plaintiff's mental state and overall well-being that he return to his previous activities. She was hopeful he could return to work full-time in thirty days. (Tr. at 358.)

Plaintiff also saw PA Samdani on February 1, 2008, reporting that his right-sided neck pain remained resolved and offering no complaints other than right-sided hemibody tingling. He denied any neck or shoulder pain, weakness or sensory loss, change in gait, or bowel or bladder dysfunction. (Tr. at 362.) PA Samdani found that plaintiff was doing well; he was to follow-up with Dr. Schneider regarding his epilepsy and hemibody tingling and return to neurosurgery in six months for a recheck of his cervical spine. (Tr. at 361.)

On February 29, 2008, plaintiff saw Dr. Schulgit, complaining of paresthesias down the lateral aspect of his lower back and right leg. He also complained of feeling his right knee giving way. On exam, he had positive straight leg raising, and Dr. Schulgit ordered an MRI of plaintiff's lumbar spine and right knee. (Tr. at 356-57.) X-rays of the right knee showed mild degenerative changes and the lumbar spine showed minimal degenerative changes. (Tr. at 302-03.) On March 5, plaintiff underwent MRI scans of the lumbar spine, which revealed a small left, paracentral disc protrusion at the T11-T12 level and a broad based posterior disc protrusion at the L5-S1 level; and the right knee, which revealed mild osteoarthritic changes and moderate joint effusion. (Tr. at 298-300.) Scans of his cervical spine taken on the same date showed a stable post-operative appearance. (Tr. at 301.)

On March 6, 2008, plaintiff returned to Dr. Schneider, reporting that after he returned to work part-time he developed increasing back pain, which made it hard to work. He also reported increasing neck pain, for which he was to see Dr. Zikel. (Tr. at 369.) He had not

12

completed the repeat EEG testing due to "personal reasons." (Tr. at 368.) Dr. Schneider was unwilling to provide any further work status reports "given the numerous overlying issues" and suggested that he obtain work status reports from his primary care physician. (Tr. at 367.)

Plaintiff also saw PA Samdani and Dr. Zikel on March 6, 2008, complaining of neck and back pain for one week. (Tr. at 372.) On exam, gait and station were normal, muscle strength 5/5 in the upper and lower extremities, and coordination and sensation intact throughout. Given his presentation, the normal physical exam findings, the stable cervical spine x-rays, and minimal degenerative changes seen in the lumbar MRI, Dr. Zikel suspected his neck and thoracic pain most likely consistent with muscle spasm. He therefore commended conservative treatment initially, providing a referral for physical therapy for the neck and back. (Tr. at 371.)

On March 7, 2008, plaintiff returned to Dr. Schulgit regarding his low back and knee pain. Plaintiff wanted to return to work, indicating that he would lose his job if he failed to do so. Dr. Schulgit permitted him to return as of March 10, with the admonition that he use his common sense. He had received epidural injections from a Dr. Borat, but they had not yet taken hold. (Tr. at 366.)

On April 11, 2008, plaintiff saw Dr. Schulgit regarding his back pain. Dr. Schulgit continued plaintiff's medications, including Naprosyn; he was also to continue epidural steroid injections and physical therapy, and a TENS unit was ordered for him through physical therapy. (Tr. at 380.)[4]

On May 2, 2008, plaintiff saw Dr. Schneider for follow-up of his epilepsy and right hemibody paresthesias, possibly related to migraine headaches. He reported one seizure

---

[4]Plaintiff completed this course of physical therapy between March and June 2008. (Tr. at 382-401.)

13

since his last visit, and his headaches were much better. His episodes of right hemibody tingling were also much improved. He had returned to working full-time and stated it was going well. He continued to have some intermittent problems with low back pain and neck pain. (Tr. at 378.) He was continued on Depakote and Topamax. (Tr. at 377.)

On May 19, 2008, plaintiff saw Dr. John Byrne complaining of severe low back pain. Plaintiff took a long time to get up, the paraspinal muscles were very tender on palpation, and his range of motion was markedly reduced. Dr. Byrne assessed low back pain, moderately severe, and prescribed medications including Naprosyn, Flexeril, and Vicodin, and provided Toradol in the clinic. (Tr. at 376.)

On May 22, 2008, plaintiff returned to Dr. Schulgit, who assessed thoracic disc disease with legs spindling. Plaintiff reported using a TENS unit to cope with pain at work and refused to take off of work. Dr. Schulgit prescribed Naprosyn, Vicodin, and Cyclobenzaprine, noting that plaintiff was "a highly motivated individual," and awaited Dr. Zikel's specialty input. (Tr. at 375.)

On May 27, 2008, plaintiff saw Dr. Zikel regarding his low back pain. He reported that physical therapy provided no significant improvement. On exam, there was severe tenderness to superficial light touch in the lumbosacral region. There was also a severe painful response to mild axial loading and continuous grimacing with any movement. Gait and station were normal, as was strength testing. (Tr. at 374.) The recent lumbar MRI showed degenerative disc changes at L5 with mild disc bulging, as well as disc bulging at T11 and T12. Dr. Zikel assessed mechanical back pain secondary to degenerative disc disease. Given the mild MRI finding, he did not recommend surgery. Instead, he suggested an aggressive course of weight loss and resumption of physical therapy with back and abdominal strengthening exercises. In

14

addition, he recommended plaintiff restructure his lifestyle so he was not required to perform frequent heavy lifting and bending. These measures should, Dr. Zikel opined, provide significant improvement. He was to return in two to three months to gauge his progress. (Tr. at 373.)

On June 20, 2008, plaintiff returned to Dr. Schulgit, eager to go back to work.[5] He demonstrated good range of motion of the back and negative straight leg raising to 90 degrees. Dr. Schulgit continued Naprosyn, Cyclopenzaprine, and Vicodin. (Tr. at 511, 563.)

On July 14, 2008, plaintiff saw Dr. Pagano for a second opinion regarding his right facial and arm tingling and numbness. Dr. Pagano recommended plaintiff continue with Dr. Schneider, as the next step would be prolonged video EEG monitoring. (Tr. at 564-65.)

On August 1, 2008, plaintiff followed up with PA Samdani and Dr. Zikel, doing fairly well, with pre-operative cervical symptoms resolved. July 31, 2008 films of the cervical spine showed solid fusion. Plaintiff reported his back pain moderately improved with physical therapy since his last visit in May 2008. He denied any radiating pain or paresthesias in the lower extremities. (Tr. at 509, 514, 566.) An MRI of lumbar spine from March 2008 showed mild degenerative changes at L5 and T11 and T12. (Tr. at 508-09, 566-67.) Given his improvement with therapy and the minimal findings on the MRI, they continued to recommend conservative treatment for the lower back. (Tr. at 508, 567.)

On September 8 to 12, 2008, plaintiff underwent an EEG, which was abnormal consistent with the expression of an underlying epilepsy. The testing revealed no correlation to his right-sided tingling, however. (Tr. at 515-17, 704-06.)

_____

[5]Plaintiff's employer laid him off on May 28, 2008 due to his medical restrictions. (Tr. at 39, 205.)

15

On September 26, 2008, plaintiff saw Dr. Schulgit for knee pain. He was referred to Dr. Robert Laing for a possible cortisone injection. (Tr. at 507, 568.)

On November 21, 2008, plaintiff saw Dr. Schneider for follow-up of his epilepsy and right hemibody paresthesias. He reported his symptoms unchanged, but with no seizures since July. (Tr. at 569.) The recent EEG showed no abnormalities in association with right hemibody paresthesias, which Dr. Schneider suspected related to migraines. She continued him on Depakote for epilepsy, and Topamax and Lyrica for headache prevention and treatment of chronic neuropathic pain. She also referred him to the Comprehensive Headache Center. (Tr. at 570.)

On December 16, 2008, plaintiff saw Dr. Schulgit, complaining of memory deficits, at times speech dysarthria.[6] Dr. Schulgit ordered a brain MRI, continued medications, and recommended plaintiff see a psychiatrist. (Tr. at 571.)

On January 8, 2009, plaintiff saw Dr. Zikel to discuss his work status. He had healed nicely from the cervical spine surgery with minimal discomfort, and neck pain was not a significant issue. However, he continued to complain of significant mechanical lower back pain, worsened with standing and walking. He was referred to Dr. Subbanna Jayaprakash for pain management, as surgical intervention was unlikely to provide relief. (Tr. at 572.)

On February 6, 2009, plaintiff saw Dr. Traci Purath regarding his headaches. Dr. Purath noted that an MRI of the brain and MRA were normal in 2008. He had also undergone a long-term video EEG, which showed that these episodes had no apparent epileptiform nature to them. He had tried Keppra without any clear improvement in symptoms. (Tr. at 574.) Dr.

---

[6]Dysarthria is a disturbance of speech due to emotional stress, brain injury, or paralysis. Stedman's Medical Dictionary 550 (27th ed. 2000).

Purath assessed chronic daily headache with complicated migraine features. She did not believe this a clear hemiplegic event but more of a complicated aura. She tried glutamate stabilization to see if this would help with his chronic daily headaches and short-term memory issues. (Tr. at 575.)

On February 18, 2009, plaintiff saw Dr. Jayaprakash, reporting a history of chronic back pain, which had progressively worsened. He reported that he had been medically terminated from his job, which required heavy lifting and carrying, receiving short-term disability since June 23, 2008. He rated his pain 4-5/10, constant in nature, which made it difficult for him to get around. (Tr. at 577.) On exam, Dr. Jayaprakash noted loss of lumbar lordosis and mild tenderness over the mid lumbar spine. His range of motion was fairly good, with straight leg raising about 45 degrees bilaterally. (Tr. at 578.) Dr. Jayaprakash assessed chronic lumbar spondylosis with central annular disc tear and prescribed a course of physical therapy to provide some mobilization of the lumbar spine, as well as to recoup and recount his exercise program at home. Dr. Jayaprakash concurred with Dr. Zikel that plaintiff was not a surgical candidate. Dr. Jayaprakash further stated: "I concur with Dr. Schulgit . . . that he remains disabled on a permanent basis." (Tr. at 581.)[7]

On February 19, 2009, plaintiff saw nurse practitioner ("NP") Laura Granetzke for follow-up regarding his headaches. She assessed chronic daily headache with possible complicated aura and considered a possible referral to Froedert Hospital for neuro-psychological testing. (Tr. at 52-83.) On February 24, plaintiff told NP Granetzke that his episodes were worsening. (Tr. at 584.) She assessed chronic daily intractable headache with possible hemicrania

_____

[7]Between February and April 2009, plaintiff underwent physical therapy for his back. (Tr. at 694-98.)

17

continua features and advised plaintiff that if an episode lasted longer than thirty minutes, he should go to the emergency room. Secondary to his complaint of blurred vision, she also advised him to see an opthalmologist for a dilated eye exam. She also referred him to Froedert for neuro-psychological testing and prescribed Indocin and continued him on a Namenda dose pack. (Tr. at 585-86.)

On March 5, 2009, plaintiff visited the emergency department, complaining of slurred speech and tingling in the extremities, symptoms lasting greater than thirty minutes. (Tr. at 690.) The ER doctor contacted Dr. Pagano, who recommended a head CT and treatment with Topamax. The head CT was normal (Tr. at 691), and plaintiff was advised to follow up with Dr. Scheider (Tr. at 692).

On March 12, 2009, plaintiff saw NP Granetzke for follow-up of his headaches. Plaintiff reported a headache lasting two hours the previous week. He went to the ER, where a CT scan showed no evidence of an acute intracranial event. He was examined and discharged with a diagnosis of hemiplegic migraine event. (Tr. at 587.) NP Granetzka increased his Indocin, told him to keep his appointment with a neuropsychologist, and follow-up with Dr. Purath. (Tr. at 588.)

On April 15, 2009, plaintiff returned to Dr. Jayaprakash (Tr. at 589), who "encouraged him to continue with his retirement from the State of Wisconsin, for which he is presently applying." Dr. Jayaprakash continued plaintiff's current course of medication management. (Tr. at 591.)

On May 6, 2009, plaintiff saw Dr. Schneider, reporting one seizure since his last visit in February, with no further problems since then. He reported that his headaches were improving, and Dr. Schneider continued current doses of Depakote, Topamax, and Lyrica. (Tr. at 592-93.)

18

On May 27, 2009, plaintiff returned to Dr. Purath, reporting that his headaches were "under wonderful control." (Tr. at 595.) He also saw Dr. Jayaprakash on that date, reporting that he did a lot of work around the house over the weekend and felt exquisite pain over the lower lumbar spine. Dr. Jayaprakash prescribed Vicodin for additional pain control. On exam, Dr. Jayaprakash noted that plaintiff winced in severe pain and discomfort; his range of motion was severely limited; and his gait remained severely antalgic as well. (Tr. at 596-97.) Dr. Jayaprakash assessed acute flare of lower back pain secondary to yard work. (Tr. at 598.) Plaintiff had recently completed a course of physical therapy and was doing reasonably well until the flare-up. (Tr. at 599.)

On June 22, 2009, plaintiff saw Dr. Schulgit, discussing problems with his nineteen year old son. His diabetes was fairly well controlled, and he was to return in four months. (Tr. at 600.)

On August 27, 2009, plaintiff saw NP Granetzke for follow-up of his headaches, doing very well, with headaches under exceptional control. (Tr. at 601.) Medications were continued, and he was to follow-up in six months. (Tr. at 602.)

On August 29, 2009, plaintiff visited the emergency department complaining of right-sided weakness, different from his usual hemiplegic headaches. (Tr. at 686.) Dr. Thomas Kirages recommended plaintiff be admitted, but after his condition improved plaintiff signed out against medical advice. (Tr. at 687-88.)

On September 21, 2009, plaintiff saw NP Granetzke, reporting that two days after his last visit he had another episode, which lasted more than ½ hour, so he went to the ER. He reported no further episodes since then. Plaintiff had completed a neuro-psychiatric evaluation through a Dr. Doers in Kenosha, which found plaintiff severely depressed and in need of a

consult with a psychologist or psychiatrist. (Tr. at 603.) Plaintiff indicated he had an appointment with a psychologist but did not wish to see a psychiatrist and refused to take anti-depressants. (Tr. at 604.)

On October 15, 2009, plaintiff saw Dr. Jayaprakash, reporting that he had to manage the household with little help. He had been diligent in his range of motion exercise program. (Tr. at 605.) On exam, he had marked paraspinal spasms in the left side coinciding with his T11-T12 disc issues. Forward flexion was 25 degrees at best, extension 5 degrees. (Tr. at 606.) Dr. Jayaprakash assessed thoracic and lumbar discogenic spondylosis and chronic mid and low back pain. (Tr. at 608.) He continued the current course of pain management and renewed Vicodin. (Tr. at 609.)

On October 22, 2009, plaintiff returned to Dr. Schulgit, with his diabetes and headaches under good control. Plaintiff has paraspinal muscle soreness, with positive straight leg raising of 30 degrees. Medications were continued, and he was to return in six months. (Tr. at 610.) Plaintiff received rehabilitative services related to his lumbar disc disease from November 3-17, 2009, attending five of five sessions, with pain reduced. (Tr. at 683-84.)

When he saw Dr. Schneider in January 2010, plaintiff reported no seizures since his last visit in May 2009. (Tr. at 611.) Now that he had stabilized, she decided to taper off Depakote but ordered testing before giving instructions to taper the medication. (Tr. at 612.)

On February 26, 2010, plaintiff saw NP Granetzke, reporting no further hemiplegic headaches since his last visit in September 2009 but continued numbness on the right side. This had been consistent since his cervical fusion but seemed over the last week to have spread. He reported the sensation triggered by agitation, specifically stress when fighting with his children. He also complained of generalized joint pain and fatigue. He was advised to

20

follow up with Dr. Schulgit (Tr. at 613-14) and return to NP Granetzke in one month, with medications continued (Tr. at 615).

On March 5, 2010, plaintiff saw Dr. Schulgit, complaining of multiple arthralgias. Plaintiff had elements of a mixed connective tissue disorder, possibly lupus, and was referred to Dr. Thomas Murphy, a rheumatologist. (Tr. at 616-17.)

On March 17, 2010, plaintiff saw Dr. Murphy regarding his complaints of pain throughout the body. (Tr. at 618.) Dr. Murphy assessed knee pain, which he suspected due to underlying osteoarthritis, ordering x-rays. Dr. Murphy also ordered additional tests based on symptoms of lupus. He also found several fibromyalgia tender points and ordered blood work to see if other underlying processes may be contributing to these symptoms. (Tr. at 619.) Plaintiff was to follow up in two weeks to go over the blood work and x-rays. (Tr. at 620.) X-rays taken on March 17 showed mild osteoarthritis in the hands/wrists (Tr. at 680) and mild osteoarthritis of knees bilaterally, with no acute findings (Tr. at 681).

On March 20, 2010, plaintiff was hospitalized for what doctors called a "transient neurological attack." Doctors ordered a full work-up, including an MRI, MRA, and EEG, which came back essentially normal. He was told to follow-up with Dr. Schneider and Dr. Purath. (Tr. at 670-79.) Plaintiff described a pressure-like sensation on the top of his head, followed by weakness and spasm of the right side of the face as well as pain in the right arm with weakness. He reported eight of these spells that day. A CT scan taken in the ER was negative for any acute lesion. (Tr. at 621.) Dr. B.H. Park continued Depakote and Lyrica, with the Topamax dosage increased. (Tr. at 623.)

On March 26, 2010, plaintiff followed up with NP Granetzke regarding his headaches. Plaintiff reported that this past Saturday he woke up in the morning to a pressure-type

sensation on the right side of his face; he also had trouble with his speech and his right eyelid was drooping. His children called 911, and he was taken by ambulance to the hospital and admitted for very extensive work-up, which was unremarkable. Plaintiff reported feeling better but continued to have very light pressure on the right side of his face. (Tr. at 624.) Dr. Purath felt the recent hospitalization was unlikely a hemiplegic migraine. They ordered a CTA of the carotid arteries and thoracic aorta (Tr. at 625) and suggested a follow up with Dr. Murphy regarding a positive ANA test (suggestive of lupus) (Tr. at 626). A March 30 CT angiogram of the head and neck showed no abnormalities and no findings to explain plaintiff's headaches. (Tr. at 667-68.)

On March 31, 2010, plaintiff saw Dr. Murphy complaining of pain throughout his body. He displayed pain and tenderness all over the fibromyalgia tender points. Dr. Murphy assessed a possible mild case of lupus, as well as fibromyalgia. (Tr. at 627.) He started plaintiff on prednisone based on lupus symptoms. Regarding fibromyalgia, Dr. Murphy recommended plaintiff work on regular physical exercise, stress reduction, and adequate restorative sleep in the management of this condition. (Tr. at 628.)

On April 9, 2010, Dr. Schulgit wrote, in a "To Whom It May Concern Letter":

Robert Mason is a 48-year-old patient of mine over a number of years. The patient is totally disabled and unable to perform gainful employment. He has a history of transient neurological attack, history of significant hemiplegic migraines, has a seizure disorder, diabetes, chronic lower back pain, and is status post posttraumatic stress disorder from a home invasion in which family members died. It is absolutely mandatory that he be considered fully disabled. Your understanding in this matter is appreciated.

(Tr. at 541.)

On April 13, 2010, plaintiff saw NP Granetzke, reporting no further spells since the recent hospitalization. He did complain of headache, like a band around his head, since

22

starting on prednisone. He was told to discuss this with Dr. Murphy. (Tr. at 629.) A CTA of the chest, abdomen, and pelvis was to be completed later that week. (Tr. at 630.)

On April 14, 2010, plaintiff saw Dr. Murphy, still complaining of pain throughout his entire body, including his knees. Dr. Murphy assessed a mild case of systemic lupus, improved with initiation of treatment with prednisone, as well as very significant fibromyalgia with a history of chronic pain that extended from head to toe. (Tr. at 632.) He started plaintiff on Neurontin for numbness, tingling, and neuropathic symptoms, and on Plaquenil for lupus, with prednisone reduced. He again advised plaintiff to increase his level of physical activity and exertion to address fatigue, muscle aches, and myalgia. (Tr. at 633.)

On April 15, 2010, plaintiff returned to Dr. Jayaprakash, who reviewed plaintiff's various problems, including lupus, thoracic and lumbar spine problems, and depression, then stated: "Overall it is fairly clear to us that his abilit[y] to return back to any form of gainful employment is clearly over. I have also recommended that he apply for Social Security Disability benefits, which he has done." (Tr. at 634.) Thoracic spine examination demonstrated moderate tenderness as a result of his recent flare-ups of lupus and fibromyalgia. Plaintiff was also extremely tender over the upper lumbar and lower thoracic spine from his disc herniation at T11-T12. Range of motion of the lumbar spine was rather poor: forward flexion about 25 degrees, extension 5, and rotation to the right and left side about 25 degrees; straight leg raise was about 35 degrees bilaterally. (Tr. at 635.) Strength involving both lower extremities was rather poor. (Tr. at 636.) Dr. Jayaprakash concluded: "Based upon Robert Mason's presentation, given the combination[] of problems that he presently has, there is no question that long-term gainful employment has been ruled out quite categorically. I have, therefore, supported him in the idea of long-term disability which he continues to be on, and I have also

23

recommended he apply for Social Security Disability benefits as such[.]" (Tr. at 637-38.)

On April 23, 2010, plaintiff saw Dr. Schulgit, with medications continued. (Tr. at 639-40.) On May 11, he returned to Dr. Murphy, complaining of knee pain, particularly with climbing stairs, as well as neuropathic symptoms of numbness and tingling. Dr. Murphy increased his Gabapentin dose and started Arthrotec for knee pain. He also provided corticosteroid injections to the right and left knees. (Tr. at 641-42.)

On May 12, 2010, plaintiff went to the emergency department with right sided weakness. The RN noted plaintiff to walk with a normal gait when he was unaware he was being observed, but he immediately got "weak" when he saw her. (Tr. at 659.) The ER doctor, Ruthann Cunningham, spoke with Dr. Schneider, who believed this to be psychosomatic and noted that there was not one single test left to be done. Plaintiff was discharged home to follow up with his primary physician. Plaintiff became aggressive and threatening on leaving the ED, and security was called. (Tr. at 660-61.)

On May 14, 2010, plaintiff underwent a stress test, which showed a small reversible defect in the distal anterior wall and cardiac apex. (Tr. at 656.) On May 21, 2010, he saw Dr. Thomas Shimshak for a cardiac consult based on multiple risk factors and a mildly abnormal stress test. (Tr. at 643.) Dr. Shimshak recommended a coronary angioplasty. (Tr. at 644.) On May 27, 2010, plaintiff underwent left heart catheterization and stenting of the mid left descending artery. (Tr. at 653-55.)

On June 10, 2010, plaintiff saw Dr. Murphy, still having some muscle aches and pain, as well as mild depression issues. He was doing well in regard to his lupus but reported persistent symptoms of fatigue and chronic severe pain. Neurontin had not relieved his persistent joint pain, so Dr. Murphy increased the dose. Regarding his fatigue, Dr. Murphy

24

recommended he work on lifestyle modification, in particular trying to increase his level of physical activity. (Tr. at 645.) For his fibromyalgia, Dr. Murphy counseled plaintiff on the importance of regular physical exercise, stress reduction, and adequate restorative sleep. He also started plaintiff on Cymbalta for depression. (Tr. at 646.)

On June 11, 2010, plaintiff saw Dr. Shimshak for follow up after the coronary intervention. Plaintiff reported vast improvement in his previous complaint of right-sided weakness and numbness, without significant symptoms and feeling much better. (Tr. at 647.)

On June 15, 2010, plaintiff underwent EMG and nerve conduction studies with Dr. Park based on complaints of pain and numbness in both hands. The tests showed mild left ulnar neuropathy at the elbow, otherwise normal. (Tr. at 651-52.)

On July 8, 2010, plaintiff saw Dr. Murphy, reporting that he still had pain all over his body and felt kind of depressed. Dr. Murphy assessed fibromyalgia, recommending plaintiff work on regular physical exercise, stress reduction, and adequate restorative sleep. He continued Cymbalta and provided Skelaxin for muscle cramps. Dr. Murphy believed a lot of what plaintiff referred to as neck and back pain was related to significant muscle tension. He also emphasized the need to stay hydrated. (Tr. at 649-50.)[8]

---

[8]Plaintiff also received mental health counseling between September 2009 and June 2010, generally addressing issues with his children. (Tr. at 542-62.) The initial assessment listed a diagnosis of depression and PTSD with a GAF of 60. (Tr. at 543.) "GAF" – the acronym for "Global Assessment of Functioning" – rates a person's psychological, social, and occupational functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

On August 9, 2010, plaintiff completed a functional capacity evaluation with Keith Hatch, PT, OCS. Hatch indicated that plaintiff's ability to perform physical work was limited by the degenerative changes to his lumbar spine and his fibromyalgia. The herniated lumbar discs limited plaintiff's tolerance for static positions, such as sitting for sedentary work, and the fibromyalgia limited his ability to recover from the physical demands of even sedentary work. His primary work limitation from the lumbar discs would be no more than twenty minutes of sitting at one time and no more than four hours per day. (Tr. at 707.) He could occasionally lift/carry up to ten pounds, never more; sit not to exceed twenty minutes at one time, with an at-will sit/stand option; rarely stand/walk (up to 6% of the work day); rarely push/pull; rarely twist and bend; and never kneel. (Tr. at 707-08.) Repetitive grasping and fine manipulation were not limited. He could occasionally lift overhead with negligible weight if sitting. He would likely need five to six unscheduled breaks during a four hour work day, with each break likely to last five minutes. Finally, he would likely be absent from work three to five days per month due to his conditions. (Tr. at 708.)

### 2. SSA Consultants

On July 14, 2008, Dr. Syd Foster completed a physical RFC assessment, finding plaintiff capable of sedentary work, with no climbing of ladders, ramps or scaffolds, and no working with hazards (e.g., machinery, heights) to account for plaintiff's epilepsy. (Tr. at 477-81, 484.) Dr. Foster reviewed plaintiff's various impairments but found that none would preclude all work. (Tr. at 482.)

On July 19, 2008, Roger Rattan, Ph.D, completed a psychiatric review technique form ("PRTF"), finding no severe mental impairment. (Tr. at 485.) He considered Listing 12.04, affective disorders, based on plaintiff's history of depression (Tr. at 488), but found only mild

limitation of function under the B criteria of Listing (Tr. at 495). Dr. Rattan noted that plaintiff had declined a psychiatric referral and attributed his inability to work to physical rather than mental problems. (Tr. at 497.)

Based on these assessments, the SSA denied plaintiff's applications on initial review. (Tr. at 71-72.) After plaintiff requested reconsideration, on October 15, 2008, Dr. James Cole reviewed and affirmed the previous physical RFC assessment from Dr. Foster. (Tr. at 518-19.) However, Dr. Biscardi recommended plaintiff undergo a detailed mental status evaluation to clarify the severity of his condition. (Tr. at 525.) On November 25, 2008, David Nichols, Ph.D., completed that evaluation, diagnosing major depression, with a GAF of 50. (Tr. at 520, 523.) Dr. Nichols concluded that plaintiff appeared capable of understanding, remembering, and carrying out instructions if they are not physically demanding. He also appeared capable of relating appropriately to supervisors and co-workers. (Tr. at 523.) On December 11, 2008, Dr. Richard Zaloudek reviewed and affirmed the previous PRTF. Dr. Zaloudek noted that, according to Dr. Nichols's evaluation, most of plaintiff's problems were physical rather than mental, and mental status did not show marked deficits. (Tr. at 526.)

## C.    Hearing Testimony

At the August 12, 2010, hearing before ALJ Robert Bartelt,[9] plaintiff's counsel moved to amend the onset date to May 28, 2008, the last day he worked. (Tr. at 35.) The ALJ then heard testimony from plaintiff, a medical expert, and vocational expert.

### 1.    Plaintiff

Plaintiff testified that he was forty-nine years old and a high school graduate with one

---

[9]The ALJ previously adjourned the hearing to permit plaintiff time to obtain counsel. (Tr. at 27-31.)

and a half years of college. He lived with his five children, ages thirteen to twenty-one, in a home he rented. (Tr. at 35-36.)

Plaintiff testified that he work for Southern Wisconsin Center, a home for the developmentally disabled, for twenty years as a food service worker and resident care technician. (Tr. at 36-38.) Plaintiff testified that his employer terminated him in May 2008 after his doctor limited him to sit-down work. (Tr. at 39.) He indicated that his condition had worsened since then, such that he could no longer perform even sit-down work because of his limited ability to sit for extended periods of time due to back pain. (Tr. at 39-40.)

Plaintiff testified that he suffered from epilepsy for forty years, but that condition was under control, and he only had seizures in his sleep. (Tr. at 40.) He also testified that he suffered from migraine headaches, which lasted about five minutes, and were helped by medication. (Tr. at 41-42.) He further testified to heart problems, for which he underwent a cardiac catheterization and placement of two stents, which helped a lot, particularly with the numbness he had been experiencing in his extremities. (Tr. at 42-43.) He also testified to experiencing problems with short-term memory and concentration. (Tr. at 43-44.) He indicated that he also suffered from arthritis in his knees, undergoing surgery on the right knee, as well as cervical spine fusion surgery. (Tr. at 44.) He testified that his rheumatologist had also diagnosed him with fibromyalgia, which caused pain and fatigue. (Tr. at 45-46.) He also saw a psychologist for depression after his wife and daughter were murdered in 2004. (Tr. at 47.) He also suffered from diabetes, but that condition was under control. (Tr. at 49.)

Plaintiff testified that he could sit for ten to fifteen minutes before he had to move. (Tr. at 50.) He indicated that he tried to get help from his children with cooking, cleaning, and shopping. (Tr. at 50-51, 55-57.) Everyone did their own laundry, and he usually took a child

28

with him grocery shopping so he did not have to carry anything. (Tr. at 51.) He tried to attend his children's activities, but he was unable to help out much because of his limitations. He had a driver's license, with no restrictions other than eye glasses, but he testified that his feet felt "heavy," almost numb, from pushing the pedals while driving. He experienced no medication side effects. (Tr. at 52.) Plaintiff testified that he was six feet tall and weighed 255 pounds, down thirty pounds over the past few months. (Tr. at 54.)

### 2. Medical Expert

The medical expert, Allen Hauer, a clinical psychologist, evaluated plaintiff's mental impairment under Listing 12.04, diagnosing, under the A criteria, dysthymic disorder – a low to mid-grade affective disorder characterized by discouragement, irritability, and dysphoric mood. (Tr. at 59-60.) He related plaintiff's condition to a grief reaction to the death of his wife and daughter, which evolved into a dysthymic disorder. (Tr. at 60.) Under the B criteria of the Listing, Dr. Hauer assessed only mild limitation of functioning. (Tr. at 60-61.) He found no work-related functional limitations. (Tr. at 61.)

### 3. Vocational Expert

The vocational expert ("VE"), Ronald Raketti, classified plaintiff's past work a resident care aide as medium, skilled work, and as a food service worker as medium, unskilled work. (Tr. at 63-64.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to light or sedentary work, involving minimal bending, kneeling, or stooping, with the option to change positions from sitting to standing. (Tr. at 64.) The VE testified that such a person could work as a parking lot attendant, order clerk, and arcade attendant at the light level, and at the sedentary level as an order filler, callout

29

operator, and surveillance monitor. (Tr. at 64-65.) If the person were limited according to the functional capacity evaluation performed by Mr. Hatch, he could not, given the extra breaks and excessive absences contemplated, as well as the limitation to working four hours per day, perform any jobs on a regular basis. (Tr. at 67-69.)

## D.    ALJ's Decision

On September 30, 2010, the ALJ issued an unfavorable decision. The ALJ found that plaintiff had not engaged in SGA since May 28, 2008, the alleged onset date, and that he suffered from the severe impairments of degenerative joint changes, lupus, obesity, and dysthymic disorder, none of which met or equaled a Listing. (Tr. at 16.) The medical evidence documented other problems, including migraine headaches, epilepsy, diabetes, fibromyalgia, and heart problems, but the ALJ found that these conditions were well-controlled by medication and other treatment. (Tr. at 16-17.)

The ALJ noted Dr. Schulgit's April 9, 2010 letter, which indicated that plaintiff was "totally disabled," and the physical therapist's August 9, 2010 functional capacity evaluation, which found plaintiff unable to perform even sedentary work on a full-time basis. However, the ALJ found those assessments "inconsistent with the balance of the record." (Tr. at 17.) Specifically, the ALJ noted that none of plaintiff's treating specialists had imposed any long-term debilitating work-related restrictions. Rather, Dr. Murphy indicated on July 8, 2010, that while plaintiff displayed some joint pain, muscle tension, and fatigue, he should pursue a more active course, such as exercise, stress reduction, and proper medication management. (Tr. at 17.) Based on a review of plaintiff's written submissions, the ALJ further found that plaintiff had, in fact, been able to engage in a number of daily activities consistent with the ability to work at the light level, including managing personal care, preparing some meals, doing dishes

and laundry, cleaning, cutting the grass, driving, shopping, attending school events, supervising his five children, and even looking for work. (Tr. at 17.) Plaintiff claimed trouble with prolonged sitting, even though he did considerable driving, and in a function report he admitted that he could walk as far as 200 yards and lift up to twenty-five pounds. (Tr. at 17.)

In view of the objective findings, the effectiveness of treatment, and his activity level, the ALJ found that plaintiff had not demonstrated that he suffered from pain or any other symptoms that could be considered disabling in severity. Rather, the ALJ found that plaintiff retained the RFC to perform a wide range of light work, with a sit/stand option, and which would not involve more than minimal exertional postural motions (bending, twisting, stooping, crouching, and kneeling).[10] Given this RFC, plaintiff lacked the ability to return to past work, performed at the medium level. (Tr. at 18.) The ALJ therefore proceeded to step five, where, relying on the VE's testimony, he found that plaintiff could perform other jobs, including order clerk, parking lot attendant, arcade attendant, order filler, callout operator, and surveillance monitor. (Tr. at 18-19.) The ALJ therefore found plaintiff not disabled. (Tr. at 19.)[11]

---

[10]Relying on the testimony of the medical expert at the hearing, the ALJ found that plaintiff experienced no significant mental limitations. (Tr. at 18.) Although plaintiff does not argue that the ALJ erred in assessing his mental impairment, I do note that the ALJ's finding that plaintiff had a severe mental impairment does seem inconsistent with his finding that plaintiff experienced no work-related mental limitations. See Coppernoll v. Astrue, No. 08-cv-382, 2009 WL 1773132, at *15 (W.D. Wis. June 23, 2009) ("Either plaintiff's headaches do not pose more than a minimal effect on her ability to work, in which case he should have found them to be non-severe at step two, or they do, in which case he should have should have made a specific finding regarding the effects that plaintiff's headaches would have on her ability to work.").

[11]Plaintiff submitted to the Appeals Council the report of a January 20, 2011 cervical MRI, which revealed a small central disc herniation at C7-T1, a mild disc bulge at C2-C3, and progressive degenerative disc disease at C4-C5. (Tr. at 709-11.) Because this evidence was not before the ALJ, I may not consider it in reviewing his decision. See Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993) (stating that the correctness

## III.  DISCUSSION

Plaintiff argues that the ALJ erred in rejecting Dr. Schulgit's April 9, 2010 letter-report, and therapist Hatch's August 9, 2010 functional capacity evaluation, and in considering the credibility of his testimony.  I agree.

An ALJ must offer "good reasons" for discounting the opinion of a social security claimant's treating physician.  Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011).  If the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record, the ALJ must afford it "controlling weight."  20 C.F.R. § 404.1527(c)(2); Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011).  Even if the ALJ finds good reasons for not giving the opinion controlling weight, he must decide what weight the opinion does deserve, considering a checklist of factors including the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.  Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010); see also Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008) (explaining that when the treating physician's opinion is not given controlling weight "the checklist comes into play").

Opinions from non-physician providers, such as physical therapists, may not receive controlling weight.  See 20 C.F.R. §§ 404.1502 & 404.1513.  Nevertheless, opinions from these sources are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.  SSR 06-03p; see also Barrett v. Barnhart, 355 F.3d 1065, 1067 (7th Cir. 2004) ("Although Barrett is wrong to argue

———————————————

of an ALJ's decision depends on the evidence that was actually before him).

that a physical therapist's report should be given controlling weight, such reports are entitled to consideration."); Lauer v. Apfel, 169 F.3d 489, 494 (7th Cir. 1999) (noting that reports from physical therapists "are helpful when determining functional capacity").

In the present case, the ALJ found the reports from Dr. Schulgit and therapist Hatch "inconsistent with the balance of the record" (Tr. at 17), but he provided little explanation for this conclusion. The ALJ first stated: "None of the claimant's treating physicians (neurologist, rheumatologist, cardiologist) have imposed any long-term debilitating work-related restrictions." (Tr. at 17.) However, the ALJ ignored the records from Dr. Jayaprakash, plaintiff's pain management specialist, who "concur[red] with Dr. Schulgit . . . that [plaintiff] remains disabled on a permanent basis." (Tr. at 581.) Based on examination and review of plaintiff's various ailments, Dr. Jayaprakash concluded that plaintiff's ability "to return back to any form of gainful employment is clearly over." (Tr. at 634.)

The Commissioner notes that Dr. Jayaprakash did not provide specific functional limitations, and that the only acceptable medical sources who did provide specific physical RFC assessments were Drs. Foster and Cole, the state agency physicians, both of whom opined that plaintiff could perform sedentary work. The Commissioner further notes that while the ALJ found plaintiff capable of light work, the VE also identified sedentary jobs, which the ALJ listed in his decision. (Tr. at 19.) However, the ALJ never even mentioned the Foster/Cole reports, much less relied on them in making his decision. As indicated above, judicial review is limited to the reasons set forth in the ALJ's decision; the Commissioner's lawyers may not provide a post-hoc justification. See Spiva, 628 F.3d at 348.

The Commissioner nevertheless argues that, in light of the Foster/Cole reports, remanding for consideration of Dr. Jayaprakash's opinions would be a waste of time because

the ALJ's decision is overwhelmingly supported by the record. The harmless error doctrine applies in social security cases, but it does not permit the court to overlook serious omissions in the ALJ's analysis so long as the Commissioner "can find enough evidence in the record to establish that the [ALJ] might have reached the same result had [he] considered all the evidence and evaluated it as the government's brief does." Spiva, 628 F.3d at 353. The Commissioner states that Dr. Jayaprakash's opinion that plaintiff's ability "to return back to any form of gainful employment is clearly over" (Tr. at 634) transgresses ground reserved to the ALJ. See 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). However, even a bottom line statement from a treating source should not be ignored. See Henderson v. Barnhart, 205 F. Supp. 2d 999, 1013 (E.D. Wis. 2002).[12] At all events, Dr. Jayaprakash's treatment notes, summarized above, discuss specific clinical findings and objective test results (in addition to plaintiff's subjective complaints) supporting his conclusions. The ALJ ignored this entire line of evidence.

Perhaps the ALJ will on remand agree with the Commissioner's assessment of Dr. Jayaprakash, but that is far from certain. It is also worth noting in this regard that the reports from Drs. Foster and Cole, which the Commissioner suggests are certain to be followed on remand, were prepared in 2008. The record contains significant medical evidence from 2009 and 2010, including the notes from Drs. Jayaprakash and Murphy (who diagnosed additional conditions – lupus and fibromyalgia), which must also be considered, along with plaintiff's

---

[12]As the Commissioner notes, Dr. Schulgit's letter also addressed the "ultimate issue" in the case, which is reserved to the ALJ. However, as indicated in the text, this does not permit the ALJ to ignore such an opinion. Further, as the Commissioner acknowledges, therapist Hatch provided a detailed functional assessment, based on testing.

testimony that his condition worsened after the May 2008 termination of his employment. (Tr. at 39-40).

Having bypassed the Foster/Cole reports, the ALJ cited no contrary medical opinion in rejecting the Schulgit and Hatch reports. Nor did he engage in a meaningful review of the extensive treatment records. Instead, as his second reason for rejecting the Schulgit/Hatch reports, he culled from the 700+ page transcript a single record, the July 8, 2010 note from Dr. Murphy suggesting that plaintiff "pursue a more active course – regular physical exercise, stress reduction, adequate restorative sleep, sufficient hydration, and proper medication management." (Tr. at 17.) "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010) (citing Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009)). Moreover, the ALJ failed to explain how Dr. Murphy's note contradicted a finding of disability. Indeed, Dr. Murphy's suggestion appears to track the customarily recommended treatment for fibromyalgia; it provides no obvious basis for rejecting plaintiff's claim. See Johnson v. Astrue, 597 F.3d 409, 411-12 (1st Cir. 2009) (noting that the appropriate treatment for fibromyalgia involves analgesics, physical therapy, aerobic exercise, and a sleep program, and holding that the ALJ thus erred in finding a doctor's restrictive RFC opinion inconsistent with his prescription of aerobic exercise).[13]

Finally, the ALJ relied on plaintiff's daily activities to reject the Schulgit/Hatch assessments. (Tr. at 17.) However, plaintiff indicated – in his function reports, in his testimony

_____

[13]I also note that Dr. Murphy provided this advice about exercise and sleep upon first diagnosing plaintiff with fibromyalgia in March 2010 (Tr. at 628), repeating it several times thereafter (Tr. at 633, 646, 649-50). It is unclear why the ALJ decided to pluck the July 8, 2010 note out of the record.

at the hearing before the ALJ, and to his treating physicians – that he had significant difficulty in managing household chores and relied on his children to help him (Tr. at 50-51, 214-15, 596, 605), qualifications the ALJ failed to address.[14]  While an ALJ may appropriately consider a claimant's daily activities when assessing his alleged symptoms, the Seventh Circuit has cautioned against placing undue weight on household chores in considering the ability to hold a job outside the home. Craft, 539 F.3d at 680.  This is so because the "pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).  Nor may an ALJ "disregard a claimant's limitations in performing household activities." Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009); see also Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012) (noting that a person performing activities at home can get help from family members); Punzio, 630 F.3d at 712 (stating that the claimant's "ability to struggle through the activities of daily living does not mean that she can manage the requirements of a modern workplace").[15]

The ALJ made no finding that plaintiff exaggerated the severity of his pain or other limitations; indeed, the decision contains no explicit credibility determination at all.  The ALJ

---

[14]It is true that plaintiff wrote in one function report that he could sit in and drive a car for one hour (Tr. at 223) and in another that he could lift twenty-five pounds (Tr. at 254).  However, in other reports he indicated that his doctor did not want him to lift any weight. (Tr. at 223.) He further testified that his ability to sit deteriorated after he filed his application.

[15]The Commissioner argues that the "daily activities" cases plaintiff cites are distinguishable because they involved claimants alleging mental impairments (which plaintiff does not press in this court), and two of the cases involved the claimant's ability to care for young children (also not an issue in this case).  However, the Seventh Circuit has never limited its admonition against over-reliance on daily activities to social security claims based on mental impairments or to claimants raising small kids. See, e.g., Carradine v. Barnhart, 360 F.3d 751, 755-56 (7th Cir. 2004).

stated:

> 4.     In view of the objective findings and the indicated effectiveness of his treatment, along with his activity level, the claimant has not demonstrated that he suffers from pain or any other symptoms that could be considered disabling in severity, particularly pursuant to the standards referenced above.

> 5.     Rather, considering the documentary evidence overall, in light of the claimant's complaints and admitted/reported capabilities, and further taking into account the opinion of the medical expert (which is substantiated by the balance of the record), the claimant has retained the residential functional capacity to perform the requirements of up to a wide range of light work that would allow for a sit/stand option, and that would not involve more than minimal exertional postural motions (bending, twisting, stooping, crouching, kneeling, etc.).

(Tr. at 18.)  This is contrary to SSR 96-7p, which provides that:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.   It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."   It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.   The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.   This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

See also Martinez v. Astrue, 630 F.3d 693, 696-697 (7th Cir. 2011) ("There is no explanation of which of Martinez's statements are not entirely credible or how credible or noncredible any of them are."); Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003) (holding that the ALJ must provide specific reasons for his credibility finding).

## IV.  CONCLUSION

For the reasons set forth above, the ALJ's decision must be reversed.  Plaintiff requests a judicial award of benefits, but that is appropriate only if all factual issues have been resolved and the record clearly supports a finding of disability, Briscoe, 425 F.3d at 356-57, a standard

that is not met in this case, as the record contains conflicting evidence on plaintiff's ability to work. The proper remedy under these circumstances is remand for further proceedings. See, e.g., Cox v. Astrue, No. 10-C-1027, 2011 WL 3566935, at *17 (E.D. Wis. Aug. 12, 2011) (citing Neave v. Astrue, 507 F. Supp. 2d 948, 966-67 (E.D. Wis. 2007)). The ALJ must on remand reconsider the reports from Dr. Schulgit and therapist Hatch, as well as the credibility of plaintiff's allegations, under the appropriate standards and in light of the entire record. Plaintiff also asks that, if the case is remanded, I direct it to a different ALJ. However, absent evidence of bias or partiality, which I cannot find in this record, the court possesses no general power to order a case be assigned to a different judge. See Sarchet, 78 F.3d at 309. I will recommend that the Commissioner assign the matter to a new ALJ on remand. See Clifford v. Apfel, 227 F.3d 863, 874 (7th Cir. 2000).

THEREFORE, IT IS ORDERED that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 25th day of May, 2012.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

38